UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM THOMAS CLARK, et al.,

                                Plaintiffs,

        -v-

QMG Global Holdings, LLC, et al.,

                                Defendants.

No. 17-CV-7233 (KMK)

ORDER

KENNETH M. KARAS, District Judge:

        Plaintiffs William Thomas Clark ("Clark") and TDA Construction, Inc. ("TDA")

commenced this Action in 2017 against Defendants QMG Global Holdings, LLC ("QMG

Global"), Quantitative Strategies Group, LLC ("Quantitative Strategies"), QMG Founders I,

LLC ("QMG Founders"), QMG Investors, L.P., ("QMG Investors"), John A. Brunjes

("Brunjes"), individually and in his capacity as Trustee of the John W. Brunjes Estate Trust, and

Josephine M. Brunjes.  (*See* Compl. ¶¶ 1–7 (Dkt. No. 1).)  Plaintiffs asserted one claim each for

breach of contract and fraud.  (*See id.* ¶¶ 28–37.)  On November 5, 2019, Arbitrator Dominic

Falco, III ("Arbitrator Falco") issued an Arbitration Award (the "Award") in favor of Plaintiffs.

(*See* Decl. of Christopher D. Barraza, Esq., in Supp. of Mot. ("Barraza Decl.") Ex. A.

("Arbitration Decision") 39–41 (Dkt. Nos. 41-2, 41-3).)  Before the Court is Plaintiffs' Motion

To Confirm the Arbitration Award.  (*See* Not. of Mot. (Dkt. No. 41).)  For the following reasons,

the Motion is granted.

## I.  Background

        The focus of this Court's Opinion is on whether to confirm or vacate the Award, and

therefore, only the facts and background necessary to decide that issue are recounted below.

A.  Factual Background

The following facts are taken from the Arbitration Decision, Plaintiffs' Memorandum of

Law in Support of the Motion, and supporting papers.  (*See* Pls.' Mem. of Law in Supp. of Mot.

To Confirm Arbitration Award ("Pls.' Mem.") (Dkt. No. 41-1).)

This Action stems from a series of ill-fated investments that began in 2013.  In January of

that year, Clark, the President of TDA, met with Brunjes, "a sophisticated transactional attorney

with decades of legal experience," to consider retaining Brunjes in connection with "the potential

acquisition of an asset management business."  (Arbitration Decision 3, 4–5.)  In addition to

offering his legal services, however, Brunjes also invited Clark to invest in his hedge fund,

Quantitative Strategies.  (*Id.* at 5.)  Based on Brunjes's "professional experience and pedigree,"

as well as his representations regarding the fund's history, investment approach, and projected

performance, Clark agreed to invest in Quantitative Strategies.  (*Id.*)  Using funds from TDA,

Clark lent Quantitative Strategies $100,000 in February 2013, pursuant to a convertible

promissory note (the "February 2013 Note") with a maturity date of February 14, 2014.  (*Id.* at

5–6.)  In March 2013, Brunjes represented to Clark and other investors that several institutional

investment firms were close to investing between $10 million and $50 million in Quantitative

Strategies.  (*Id.* at 6.)  Relying on this representation, Clark used his personal funds to lend

Quantitative Strategies an additional $50,000 in May 2013, pursuant to another convertible

promissory note (the "May 2013 Note") with a maturity date of May 6, 2014.  (*Id.* at 6–7.)

Under both the February 2013 Note and the May 2013 Note, simple interest accrues at 15% per

annum on the unpaid principal amount, and at 18% per annum on late payments.  (*Id.* at 6, 7.)

In early 2014, Clark agreed to invest an additional $1.3 million in Brunjes's hedge fund

using funds from the William Thomas Clark IRA (the "Clark IRA"), a self-directed individual

retirement account of which Clark is the beneficiary and administrator. (*Id.* at 3, 12–15.) Under the terms initially proposed by Brunjes, Clark's investment would be secured by a mortgage on certain commercial realty in Queens (the "Ridgewood Property" or "Property") that was owned by The John W. Brunjes Estate Trust (the "Trust"), for which Brunjes acts as agent. (*See id.* at 4, 8.) This investment, Brunjes explained, would provide cash to fund the operation of Quantitative Strategies and Brunjes's related entities, QMG Founders and QMG Investors (collectively, the "QMG Entities"), while Brunjes waited for a bank to close on a mortgage for the Property. (*Id.* at 8.) Because the Property's sole tenant, Toronto Dominion Bank, had a triple-A bond rating and had just signed a "triple net long-term lease" that would pay nearly $20,000 per month, Clark believed the loan would be a "sound, conservative, securitized investment." (*Id.* at 9.) Brunjes also made various representations indicating that the investment was low risk because it was secured by a mortgage on the Property. (*See, e.g.*, *id.* at 10–11.)

But after Clark agreed to the investment, Brunjes "abruptly changed his tune," telling Clark that the investment had to be restructured because RBC Capital Markets LLC, which served as custodian of the Clark IRA, would not consider a commercial mortgage to be an acceptable investment for an IRA account. (*See id.* at 3, 11.) Brunjes therefore proposed an alternative investment structure: the Clark IRA would lend $1.3 million to QMG Founders, and the Trust, which owned the Property, would guarantee term notes executed by Brunjes in the separate amounts of $1,000,000 and $300,000 in exchange. (*Id.* at 11–12.) Clark accepted this proposal and agreed to make two separate transfers from the Clark IRA to QMG Founders, one for $1,000,000, and another for $300,000. (*Id.* at 12.)

Accordingly, on January 22, 2014, the Clark IRA lent $1,000,000 to QMG Founders, which in turn issued a term note payable to the Clark IRA in the same amount (the "Term

Note"), with interest to be paid monthly during the first five years of the 10-year term.  (*Id.* at 12–13.)  On January 28, 2014, the Clark IRA lent $300,000 to QMG Founders in exchange for the "Series 2014-1 Term Note" (the "Series Note") in the same amount.  (*Id.* at 14–15.)  That same day, the Trust executed a guaranty agreement in favor of the Clark IRA (the "Guaranty Agreement"), which agreement guaranteed the obligation of QMG Founders under the Series Note.  (*Id.* at 14.)  Although a draft version of the Guaranty Agreement capped the Trust's total payment exposure at $750,000, in the final version executed by Brunjes, this number had been reduced to $450,000.  (*Id.* at 14.)[1]  In addition, Brunjes prepared a letter agreement issued by QMG Founders (the "Side Letter"), the purpose of which was to "stitch" together the various loan documents for the Clark IRA's two separate loans.  (*See id.* at 13.)  Under the Side Letter, QMG Founders agreed to make (or cause to be made) monthly payments to Clark IRA in the amount of $6,536.66 beginning on March 1, 2014.  (*Id.* at 15–16.)[2]

Although this restructured transaction was riskier than the investment initially proposed by Brunjes, at the arbitration hearing, Brunjes could not identify any instance in which he

---

[1] Although the Series Note, like the Term Note, contained a provision limiting personal recourse against the beneficial owners of QMG Founders, the Series Note's provision did not contain an exception for fraudulent conduct—an omission Brunjes never disclosed to Clark. (Arbitration Decision 15.)  Moreover, on the same day QMG Founders and the Clark IRA executed the agreement for the $300,000 loan, Brunjes modified this agreement through a separate letter agreement that permitted QMG Founders to become a "First Risk" investor in a fund that used a proprietary computerized training system developed by Quantitative Strategies. (*Id.* at 15.)  Taking a "First Risk" position meant that if Quantitative Strategies lost money, the investor in the "First Risk" position would take up to 100% of the losses before an institutional investor took any losses.  (*Id.* at 8.)

[2] The Side Letter also made various representations—for example, that certain loan documents had been delivered in "substantially final form" to the Clark IRA, and that a mortgage and security agreement would be executed by the Trust in favor of QMG Founders—which turned out to be untrue.  (Arbitration Decision 13–14.)  Moreover, the Side Letter modified the Term Note by enabling QMG Founders to take part in a debt transaction involving the Property. (*Id.* at 13.)

advised Clark of the difference between the two investment structures.  (*Id.* at 16.)  Moreover, although Brunjes represented that he would grant Clark a mortgage on the Ridgewood Property in exchange for the $1.3 million loan, and further represented that he would provide Clark with a binder of all the executed closing documents, he did neither.  (*Id.*)

At the time of arbitration, Brunjes had not caused any payments of principal or interest to be made in satisfaction of the February 2013 Note or the May 2013 Note, (*id.* at 6, 7), and had caused only partial payments to be made in satisfaction of the $1.3 million loan from the Clark IRA, (*id.* at 17–18).  In short, of the $1,450,000 that Clark loaned from personal funds or those of TDA and the Clark IRA, only $261,726.45 had been repaid.  (*Id.* at 18.)

Plaintiffs brought this Action against Defendants in September 2017, asserting one cause of action for breach of contract and one cause of action for fraud.  (*See* Compl. ¶¶ 28–37.)  On April 18, 2018, Defendants moved to compel arbitration based on arbitration clauses in the Parties' various agreements.  (*See* Defs.' Mot. To Compel Arbitration 1–2 (Dkt. No. 30).)  After hearing oral argument on Defendants' Motion To Compel Arbitration, (*see* Dkt. (minute entry for July 26, 2018)), the Court granted Defendants' Motion and stayed the Action pending arbitration, (*see* Dkt. No. 37).

On September 7, 2018, Plaintiffs filed a Demand for Arbitration with the American Arbitration Association.  (*See* Pls.' Mem. 2; Barraza Decl. Ex. B Part 1 ("Demand for Arbitration") (Dkt. No. 41-4); Arbitration Decision 1.)  Defendants submitted an Answer and Counterclaim on September 25, 2018.  (Pls.' Mem. 2; Arbitration Decision 2.)  On January 4, 2019, Arbitrator Falco was appointed to preside over the arbitration.  (Pls.' Mem. 2.)  In an order dated June 19, 2019, Arbitrator Falco ordered that unless Defendants paid the administrative and final fee for their Counterclaim before June 21, 2019, their Counterclaim would not be

considered as part of the arbitration proceeding. (Arbitration Decision 2.) Because Defendants

failed to pay the fee, their Counterclaim was not considered as part of the arbitration. (*Id.*) On

June 24, 2019, Defendants requested to amend their answer. (*Id.*) After a hearing on the issue,

Defendants' request was granted, and, pursuant to an order dated June 27, 2019, Defendants

were allowed to file an Amended Answer and Defense. (*Id.*) The arbitration was held on

August 20–21, 2019. (*Id.*; Pls.' Mem. 3.) Clark and Brunjes both testified under oath and were

subject to cross-examination. (*See* Arbitration Decision 2; Pls.' Mem. 3.) Plaintiffs filed their

Proposed Findings of Fact and Conclusions of Law on September 23, 2019, and Defendants filed

their Reply on October 7, 2019. (Arbitration Decision 2–3.) At Arbitrator Falco's request,

however, Defendants submitted an Amended Reply on October 31, 2019 and a Second Amended

Reply on November 1, 2019, in order to address typographical errors. (*Id.* at 3.) Arbitrator

Falco issued his decision on November 5, 2019. (*See id.* at 41.)

Arbitrator Falco concluded that QMS Strategies breached its obligations to Clark and

TDA under the February 2013 Note and the May 2013 Note, and further concluded that QMG

Founders breached its repayment obligations to Clark in relation to the $1.3 million loan from

the Clark IRA. (*See id.* at 23–24.) Arbitrator Falco also concluded that Brunjes committed fraud

through his "repeated representations" that the Clark IRA would receive a mortgage on the

Ridgewood Property as security for its loan to QMG Founders. (*See id.* at 29–35.) Accordingly,

Arbitrator Falco issued the following awards: (1) $284,797.24 for breach of the February 2013

Note, to be paid by Quantitative Strategies to TDA, with interest from August 2, 2019 at the rate

of 18% per annum until fully paid; (2) $137,465.64 for breach of the May 2013 Note, to be paid

by Quantitative Strategies to Clark individually, with interest from August 2, 2019 at the rate of

18% per annum until fully paid; (3) $1,078,815.30 for breach of the Term Note, to be paid by

6

QMG Founders to Clark as administrator of the Clark IRA, with interest from August 2, 2019 at the "Default Rate" as defined in the Term Note, until fully paid; (4) $489,600.00 for breach of the Series Note, to be paid by QMG Founders to Clark as administrator of the Clark IRA, with interest at the rate of 12% per annum until fully paid; (5) $450,000 for breach of the Guaranty Agreement, to be paid by Brunjes in his capacity of the Trust, to Clark as administrator of the Clark IRA; and (6) $1,038,273.75 for damages resulting from fraud committed by Brunjes in his individual capacity, to be paid to Clark as administrator of the Clark IRA.  (*Id.* at 39–40.)[3]  The Arbitration Decision also provided that the administrative fees of the American Arbitration Association (totaling $18,600.00), as well as the compensation and expenses of Arbitrator Falco (totaling $22,048.84), were "to be borne equally" by Plaintiffs and Defendants.  (*Id.* at 41.)

B.  Procedural History

On December 9, 2019—a little over a month after Arbitrator Falco issued his Award—counsel for Plaintiffs sought leave of the Court to lift the stay and file a motion to confirm the Award.  (*See* Letter from Christopher D. Barraza, Esq., to Court (Dec. 9, 2019) ("Dec. 9 Barraza Letter") 2 (Dkt. No. 39).)  As the letter explained, Plaintiffs had sought "to negotiate a resolution to this matter with Defendants," but Defendants had failed to respond to Plaintiffs' proposal.  (*Id.* at 1.)  Plaintiffs also expressed concern that Defendants might seek to "dissipate assets" in order to avoid satisfaction of the Award.  (*Id.* at 1–2.)  Defendants did not file a motion to vacate, modify, or correct the Award.  (*See* Dkt.)

The Court lifted the stay on December 11, 2019.  (*See* Dkt. No. 40.)  Plaintiffs filed their

---

[3] The Arbitration Decision provides, with respect to the $1,038,273.75 damages award against Brunjes, that "[a]ny sums paid in satisfaction or partial satisfaction of the [amounts] award[ed]" for breach of the Term Note, Series Note, and/or Guaranty Agreement "shall be credited against this amount."  (Arbitration Decision 40–41.)

Motion To Confirm the Arbitration Award and supporting papers the following day.  (*See* Dkt. No. 41.)  Defendants filed their Memorandum of Law in Opposition to Plaintiffs' Motion on December 23, 2019.  (*See* Defs.' Mem. of Law in Opp'n to Pls.' Mot. ("Defs.' Opp'n") (Dkt. No. 42).)  On December 30, 2019, Plaintiffs filed a Reply and supporting papers.  (*See* Pls.' Reply Mem. of Law in Further Supp. of Mot. To Confirm Arbitration Award ("Pls.' Reply") (Dkt. No. 43).)  On November 6, 2020, Plaintiffs notified the Court that Defendants had so far ignored their obligation to pay the Arbitration Award, and again expressed concern that Brunjes may seek to "dissipate and sequester assets in order to avoid satisfaction of the Award."  (Letter from Joseph M. Licare, Esq., to Court (Nov. 6, 2020) 1–2 (Dkt. No. 45).)

## II.  Discussion

Plaintiffs have moved for an order confirming the November 5, 2019 Arbitration Award and entry of a judgment in favor of Plaintiffs.  (*See* Not. of Mot. 1.)  For the following reasons, the Motion is granted.

### A.  Standard of Review

Generally, confirmation of an arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected."  *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (citations and quotation marks omitted); *see also Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003) (holding that arbitration awards are entitled to great deference by the courts).  The Second Circuit has recognized that an "an extremely deferential standard of review" is appropriate in the context of arbitral awards in order "[t]o encourage and support the use of arbitration by consenting parties."  *Niagara Blower Co. v. Shopmen's Local Union 576*, 794 F. App'x 78, 80

(2d Cir. 2019) (citing *Porzig v. Dresdner, Kleinwort, Benson, North Am. LLC*, 497 F.3d 133, 139

(2d Cir. 2007)); *see also Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp.*, 103

F.3d 9, 12 (2d Cir. 1997) ("[A]rbitration awards are subject to very limited review in order to

avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and

avoiding long and expensive litigation." (internal quotation marks omitted)).

"The arbitrator's rationale for an award need not be explained, and the award should be

confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case."

*D.H. Blair*, 462 F.3d at 110 (internal quotation marks omitted).  Accordingly, "[o]nly 'a barely

colorable justification for the outcome reached' by the arbitrator[ ] is necessary to confirm the

award."  *Id.* (quoting *Landy Michaels Realty Corp. v. Local 32B-32J, Serv. Emps. Int'l Union*,

954 F.2d 794, 797 (2d Cir. 1992)).  "A party moving to vacate an arbitration award has the

burden of proof, and the showing required to avoid confirmation is very high."  *Id.*

B.  Analysis

Section 10 of the Federal Arbitration Act ("FAA") provides that an award may be

vacated:

> (1) where [it] was procured by corruption, fraud, or undue means; (2) where there
> was evident partiality or corruption in the arbitrators . . . ; (3) where the arbitrators
> were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause
> shown, or in refusing to hear evidence pertinent and material to the controversy; or
> of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them
> that a mutual, final, and definite award upon the subject matter submitted was not
> made.

9 U.S.C. § 10(a).  Section 11 of the FAA provides that an award may be modified only: "(a)

[w]here there was an evident material miscalculation of figures or an evident material mistake in

the description of any person, thing, or property referred to in the award; (b) [w]here the

arbitrators have awarded upon a matter not submitted to them . . . (c) [w]here the award is

imperfect in matter of form not affecting the merits of the controversy."  9 U.S.C. § 11.  Again, "[a]wards are confirmed so long as there is a barely colorable justification for the outcome reached."  *Guerrero v. FJC Sec. Servs. Inc.*, No. 12-CV-5763, 2013 WL 5273795, at *5 (S.D.N.Y. Sept. 18, 2013) (internal quotation marks omitted).

Defendants raise only two objections in response to Plaintiffs' Motion To Confirm.  First, Defendants argue that Plaintiffs violated § 13(a) of the FAA "by failing to provide the [C]ourt with the proper documentation reflecting the appointment of an Arbitrator."  (Defs.' Opp'n 2.) Section 13(a) provides that "[t]he party moving for an order confirming, modifying, or correcting an award shall, at the time such order is filed with the clerk for the entry of judgment thereon, also file . . . the selection or appointment, if any, of an additional arbitrator or umpire[] . . . ."  9 U.S.C. § 13(a).  Plaintiffs apparently intended to attach the Notice of Appointment as an exhibit to the Barraza Declaration filed in support of their Motion To Confirm, (*see* Pls.' Mem. 2 (referencing "Ex. C" that purported to contain the Notice of Appointment)), but the exhibit containing the Notice of Appointment was inadvertently omitted, (*see* Pls.' Reply 1 (attributing the omission to an "oversight")).  But although Defendants oppose Plaintiffs' Motion based on this omission, they do not claim to have suffered any prejudice as a result.  Moreover, Plaintiffs corrected this oversight when they attached the Notice of Appointment as Exhibit C to the supplemental declaration filed in support of their Reply Memorandum of Law, (*see* Suppl. Decl. of Christopher D. Barraza, Esq., in Further Supp. of Pls.' Mot. To Confirm Arbitration Award ("Suppl. Barraza Decl.") Ex. C ("Not. of Appointment") (Dkt. Nos. 43-1, 43-2)).  The Court will not deny Plaintiffs' Motion based on a harmless ministerial error that was quickly corrected.  *See In re Initial Public Offering Securities Litig.*, 214 F.R.D. 117, 124 & n.10 (S.D.N.Y. 2002) (granting the plaintiffs leave to amend their complaint in order to make "minor ministerial

10

changes" that were "all plainly matters of housekeeping, rather than substantive changes," particularly because the defendants had failed to make any showing of prejudice or bad faith).

Second, Defendants argue that the $1,038,273.75 damages award assessed against Brunjes individually should not include statutory interest, as Plaintiffs have requested in their Motion.  (*See* Defs.' Opp'n 4; Pls.' Not. of Mot. 1–2.)  Defendants point out that although the Arbitration Decision awards the Clark IRA $1,038,273.75 for damages resulting from Brunjes's fraud, (*see* Arbitration Decision 40), "there is no mention of statutory interest to be paid on this sum," (Defs.' Opp'n 4).  Without invoking any statutory or decisional authority, Defendants suggest there is "no basis for awarding statutory interest to be paid on an arbitration award based on a fraud claim."  (*Id.*)  This argument falls wide of the mark.  As courts in this district have observed, 28 U.S.C. § 1961(a) "mandates post-judgment interest for civil money judgments recovered in federal district court."  *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund v. S&S Kings Corp.*, No. 19-CV-01052, 2019 WL 4412705, at *4 (S.D.N.Y. Sept. 16, 2019) (confirming arbitration award and granting post-judgment interest pursuant to 28 U.S.C. § 1961(a)); *Trs. for Mason Tenders Dist. Council Welfare Fund v. JTL Constr. Corp.*, No. 18-CV-9025, 2020 WL 5370911, at *3 (S.D.N.Y. Sept. 4, 2020) (same); *see also Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004) (observing, in the context of a case confirming an arbitration award, that "[t]here [was] no question but that the post-judgment interest awarded in this case was mandatory under § 1961").  As stated, Defendants cite no authority for the proposition that courts may not grant post-judgment interest on arbitration awards based on fraud.  Nor have Defendants sought to distinguish cases—such as *Salus Capital Partners, LLC v. Moser*, 289 F. Supp. 3d 468 (S.D.N.Y. 2018)—that conclude just the opposite.

*See id.* at 483 (awarding "mandatory" post-judgment interest, pursuant to 28 U.S.C. § 1961, on an arbitration award that included $98,355.86 based on the defendant's fraudulent conduct).

Moreover, a review of Arbitrator Falco's decision demonstrates that it was careful and well-reasoned.  For example, in addition to the undisputed facts set forth in Part I.A *supra,* the Arbitrator made additional factual findings based on the evidence presented at the arbitration. Arbitrator Falco concluded that while Clark was a "credible witness," Brunjes's "testimony on several key points was not."  (Arbitration Decision 18.)  For example, despite holding himself out as an accomplished transactional attorney, Brunjes could not supply a credible explanation for (1) why he restructured a relatively safe $1.3 million loan secured by a mortgage to a much riskier loan in which the Clark IRA became a "third party beneficiary" of a mortgage given by the Trust to QMG Founders, or (2) why a mortgage was never given to the Clark IRA as security for its investment, as Brunjes had repeatedly assured Clark it would be.  (*Id.* at 18–19.) Weighing the evidence before him, Arbitrator Falco concluded: (1) that Brunjes "made promises to Clark that . . . he never intended to fulfill," namely that the Clark IRA would receive a mortgage on the Ridgewood Property; (2) that Brunjes knew the statements he made to Clark were untrue at the time he made those statements; (3) that Brunjes intended to induce Clark's reliance on his untrue statements, particularly in view of Brunjes's own motive (to obtain funding for his start-up business) and knowledge (that Clark had placed significant trust in him because of their attorney-client relationship and Brunjes's putative reputation as a sophisticated transactional attorney); and, finally, (4) that Clark had relied upon Brunjes's statements to his (considerable) detriment.  (*Id.* at 32–35.)  Accordingly, the Arbitration Decision concludes that Plaintiffs showed by clear and convincing evidence that Brunjes committed fraud under Connecticut law.  (*Id.* at 35.)

12

With respect to Plaintiffs' breach of contract claim, Defendants themselves conceded having breached their obligations under the February 2013 Note and the May 2013 Note. (*Id.* at 23.)  They also conceded having breached their repayment obligations under the Term Note, Series Note, and Guaranty Agreement, among other agreements. (*Id.*) Apart from Defendants' concessions, Arbitrator Falco found that the evidence itself showed a breach of contract with respect to these agreements. (*See id.* at 24 nn.12–13; *id.* at 24–26.)

Having reviewed the record and Defendants' objections, there is no evidence that the Arbitration Decision was made arbitrarily, exceeded the Arbitrator's authority, or otherwise was contrary to law. *See Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund v. Dejil Sys., Inc.*, No. 12-CV-5, 2012 WL 3744802, at *3 (S.D.N.Y. Aug. 29, 2012) ("Where, as here, there is no indication that the arbitration decision was made arbitrarily, exceeded the arbitrator's jurisdiction, or otherwise was contrary to law, a court must confirm the award upon the timely application of any party.").  There being more than barely colorable justification for the Arbitrator's Award and no material issue of fact for trial, the Court grants Plaintiffs' Motion and confirms the Award.

### III.  Conclusion

For the foregoing reasons, the Court grants Plaintiffs' Motion To Confirm the Arbitration Award.  The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 41), and to close the case.

SO ORDERED.

DATED:      December 2, 2020
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

13